UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 2:21-CR-00008 |
| | ) | |
| [1] THOMAS K. WEIR | ) | |
| | ) | JUDGE TRAUGER |
| [3] WILLIAM L. DONALDSON | ) | |
| | ) | |
| [4] PAMELA SPIVEY | ) | |

## UNITED STATES' TRIAL BRIEF

The United States of America, through Henry C. Leventis, United States Attorney for the

Middle District of Tennessee, and Assistant United States Attorneys Sarah K. Bogni and Nani M.

Gilkerson, hereby presents its trial brief.[1]

## I.      SUMMARY OF THE FACTS

This case centers around two pharmacies located in Celina, Tennessee, a small town of

roughly 1,500 people in rural Clay County near the Kentucky border.  The first pharmacy, Oakley

Pharmacy, Inc. d/b/a Dale Hollow Pharmacy ("Dale Hollow"), was owned and operated by

defendants Thomas Weir and Charles Oakley.[2] Defendant William Donaldson, a former

pharmacist, worked as a patient recruiter at Dale Hollow. The second pharmacy, Xpress Pharmacy

of Clay County d/b/a Clay County Xpress ("Xpress"), was owned and operated by Weir and

---

[1] The United States provides a streamlined trial brief given the significant amount of pretrial
litigation in this case and the detailed responses the United States has filed opposing defendants'
thirty-two motions in limine and their second motion to dismiss. The United States filed four
motions in limine, to which defendants have responded.

[2] Mr. Oakley pleaded guilty in January 2024 to a conspiracy to illegal dispense controlled
substances and a health care fraud conspiracy.

defendant Pamela Spivey. Between 2014 and 2019, Dale Hollow and Xpress dispensed huge quantities of controlled substances, including oxycodone, hydrocodone, morphine, buprenorphine, alprazolam, and other Schedule II, III, and IV controlled substances, to patients defendants knew were abusing and diverting these drugs. Defendants agreed to keep filling and billing for these prescriptions even after they were repeatedly warned that their conduct violated state and federal law. The complex history of relationships between defendants Weir, Donaldson, and Spivey and the conduct that led to the charges in this case is summarized below.

### A.    Background on Donaldson and Dale Hollow Pharmacy

Donaldson was one of the original owners of Dale Hollow Pharmacy, which was formerly known as "Donaldson Pharmacy." Donaldson Pharmacy opened in 2002 and was owned and operated by Donaldson and his twin sister, Anne Oakley. Both Donaldson and Anne Oakley were licensed pharmacists.  Charles "Bobby" Oakley, Anne's husband, was a pharmacy technician and the pharmacy manager. For a time, Spivey worked for Donaldson Pharmacy as a pharmacy technician.[3] Spivey later left Donaldson Pharmacy and opened up competing Xpress Pharmacy.

In 2011, Donaldson was charged by federal indictment with five counts of illegally distributing hydrocodone from Donaldson Pharmacy to a patient of the pharmacy. *United States v. William L. Donaldson*, Case No. 3:11-CR-00079 (M.D. Tenn.). In late 2012, he pleaded guilty to the charges and in 2013 he was sentenced to serve fifteen months in prison followed by a period of supervised release. *Id.* As a result of his illegal conduct, Donaldson agreed to the revocation of his license to practice pharmacy and admitted his conduct to the Tennessee Department of Health, Board of Pharmacy, by consent order. (DE #301-1, consent order.) Ownership of Donaldson

---

[3] Donaldson and Spivey previously worked at Rite Aid Pharmacy in Celina, Tennessee.

Pharmacy was transferred to Anne and Bobby Oakley, and it was rebranded as "Oakley Pharmacy."

By 2014, Oakley Pharmacy was struggling financially. Many of its patients had abandoned the pharmacy in the absence of Donaldson and moved over to neighboring Xpress Pharmacy, owned by Spivey, which was its direct competitor. Anne Oakley's health was also deteriorating and the Oakleys decided to hire pharmacist John Polston to fill in for Anne. Polston had previously worked for Spivey at Xpress Pharmacy. Polston had prior suspensions of his pharmacist license in Kentucky for wrongful distribution of controlled substances. Polston continued to have issues with his license after joining Oakley Pharmacy. In January 2014, a physician reported Polston to the Tennessee Board of Pharmacy for distributing controlled substances in her name to a patient for whom she had not written a prescription. After an investigation corroborated these allegations, Polston entered into a consent order with the Board of Pharmacy, which placed restrictions on his license.

### B. Weir's Investment in Dale Hollow and Donaldson's Return to the Pharmacy

In the Spring of 2014, Donaldson was released from prison and began his term of supervised release back in Celina. At around the same time, defendant Thomas Weir, a childhood friend of Donaldson, purchased a majority interest in Oakley Pharmacy. At that point, the pharmacy was on the verge of closing, and Weir hoped, through his management and investment, that he could make the pharmacy profitable again. Weir, an accountant who owned a fiber optics business, decided he wanted to create a health care empire in low-income areas, and he started with Oakley Pharmacy, which he rebranded as "Dale Hollow Pharmacy."

One of Weir's first moves as the majority owner of Dale Hollow was to invite Donaldson to return to the pharmacy. Officially, Weir hired Donaldson to work as a "greeter" in the pharmacy,

3

recognizing that despite Donaldson's criminal history, Donaldson held sway over many pharmacy patients who remained loyal to Donaldson from his days as a pharmacist. Despite warnings from local law enforcement not to bring Donaldson as a convicted felon back into the business, Weir set up a desk for Donaldson inside the pharmacy where Donaldson consulted with patients and helped sign them up for Medicare and Medicaid (known as TennCare in Tennessee). Weir also invited Polston to take over for Anne Oakley as pharmacist-in-charge of Dale Hollow, and used Polston's licensure issues as an excuse to pay Polston substantially less than the going rate for a pharmacist. Weir put his wife and young stepdaughter on the board of directors of the pharmacy and hired his stepdaughter as a pharmacy technician. She became his "eyes and ears" in the pharmacy, with keys to the pharmacy and the combination to the controlled substances safe, responsibilities usually reserved for the pharmacist-in-charge.

Weir knew that one of the keys to Dale Hollow's success was to recruit Donaldson's old patients back to the pharmacy. In addition to advertising that Donaldson, just released from prison, had returned to the pharmacy,[4] Weir and Donaldson developed a currency called "Monkey Bucks" that could be used like cash at the pharmacy. Monkey Bucks, which included the likeness of Carlos, Donaldson's pet monkey, was handed out to prospective patients as an incentive to fill their prescriptions at Dale Hollow. Weir also directed pharmacy staff to provide certain patients who had prescriptions with high reimbursement rates regular "payouts" from the cash register for filling their prescriptions at Dale Hollow. Donaldson, in his new role, covered patient co-pays and transported pharmacy patients to and from doctor appointments and then back to the pharmacy to fill prescriptions. Weir purchased a bright green Kia Soul for Donaldson to use to chauffeur pharmacy patients and deliver medications for the pharmacy.

---

[4] An advertisement in the local paper invited patients to come to the pharmacy to "see Bill."

4

Donaldson, for his part, was happy to be back at the pharmacy, which he still viewed as his own. He worked to bring his patients back to Dale Hollow, catering to their needs and facilitating patients' abuse and diversion of the pills dispensed by the pharmacy. Donaldson drove pharmacy patients all over Middle Tennessee to doctors who would write them controlled substances prescriptions. He paid patient co-pays for these doctor's visits and then he delivered patients back to the pharmacy where he insisted they be filled. He then let patients abuse their pills at his house where they partied with Donaldson and bought, sold, and traded pills with Donaldson's knowledge. Patients repaid Donaldson with cash and with pills.

As a result of Donaldson's efforts, patients flocked to Dale Hollow. They arrived in droves, congregating in the pharmacy near Donaldson's desk. Some were obviously high when they came to the pharmacy; others exhibited signs that they were abusing and diverting the controlled substances the pharmacy dispensed to them.

Despite these red flags, Weir, Donaldson, and Polston endeavored to fill any and all prescriptions presented at Dale Hollow. As a result, Dale Hollow quickly gained a reputation within Clay County and beyond that it would fill prescriptions that other pharmacies would not. This included dangerous combinations of controlled substances known to be highly abused and diverted, such as benzodiazepines and opioids and what is known as the "holy trinity" or drug "cocktail"—a benzodiazepine, opioid, and muscle relaxer.  The trinity, in particular, was well known to cause significant risk of death by respiratory depression and was highly sought after by those who abuse and divert prescription drugs. The Centers for Disease Control, Food and Drug Administration, DEA, state and federal boards of medicine, and insurers, including TennCare and Medicare, issued numerous warnings to prescribers and pharmacies about taking these drugs together, yet Dale Hollow repeatedly dispensed these dangerous combinations to patients.

5

Weir, Donaldson, and Polston also concocted a plan to start dispensing the opioid buprenorphine, a Schedule III controlled substance used to treat opioid use disorder.[5] Weir was aware of buprenorphine from employing recovering opioid addicts at his fiber optics business. There are two common formulations of buprenorphine: buprenorphine-only products (known by the brand name Subutex) and buprenorphine with naloxone (known by the brand name Suboxone). The addition of naloxone to buprenorphine blocks opioid receptors in the brain and inhibits the ability to obtain a high off buprenorphine and prevents the user from injecting buprenorphine to get high. Without naloxone, buprenorphine can be abused in the same way as any other opioid, and can cause respiratory depression, especially when combined with benzodiazepines. As such, Tennessee law provides that only individuals who are pregnant, breastfeeding, or have an allergy to naloxone should be prescribed buprenorphine-only products. The potential for abuse of buprenorphine-only products made them highly sought-after by those addicted to opioids and they became a drug with a high street value that was commonly diverted.

At Weir's direction, Dale Hollow began purchasing large amounts of buprenorphine, which the pharmacy began dispensing to patients who came from near and far to fill at Dale Hollow. By 2016, Dale Hollow was one of the top buprenorphine purchasers in the state of Tennessee. At that time, nearly half of the buprenorphine dispensed by the pharmacy was Subutex, the buprenorphine-only product that was meant for a very small subset of the population who was pregnant, breastfeeding, or had a hypersensitivity or allergy to naloxone.[6] The pharmacy did not verify that

---

[5] By law in Tennessee, Buprenorphine cannot be prescribed as a treatment for pain.

[6] According to the CDC, at any given time, only about 5% of the population has an allergy or sensitivity to a substance like naloxone. In effect, unless pregnant or nursing, approximately 95% of patients prescribed buprenorphine for opioid use disorder should be taking buprenorphine-naloxone, as a deterrent to the abuse and diversion of buprenorphine-only products. The Tennessee Nonresidential Buprenorphine Treatment Guidelines cite similar percentages.

6

Subutex was being appropriately prescribed to its patients. As with its dispensing of other controlled substances, the pharmacy ignored red flags that patients were abusing and diverting buprenorphine and continued to push for increased sales of buprenorphine-only products.

### C. Weir's Purchase of Xpress Pharmacy

After Dale Hollow recruited its patients back and scores of new patients arrived for the opioid buprenorphine, Xpress Pharmacy began to struggle financially. Spivey, in desperation, reported Dale Hollow Pharmacy to the Board of Pharmacy for early refills of controlled substances and complained about Donaldson's presence at Dale Hollow, telling the Board that Xpress simply could not compete. A few months later, Xpress pharmacist Michael Griffith made a similar complaint about early refills at Dale Hollow. Staff at Xpress also repeatedly called the Board of Pharmacy to complain about Dale Hollow, including that Donaldson had called to move patient prescriptions from Xpress to Dale Hollow. Then, in April 2015, Xpress's pharmacist-in-charge, Tara Anderson, took most of the staff of Xpress and opened up another competing pharmacy in a building directly between Dale Hollow and Xpress.[7] Celina, a town with a population of approximately 1,500, now had four retail pharmacies all within 1,000 yards of one other.

In October 2015, despite Spivey's knowledge of Donaldson's prior conviction and role at Dale Hollow Pharmacy, and despite reporting Dale Hollow to the Board of Pharmacy, Spivey sold a majority interest in Xpress to Weir. Weir and Spivey, along with Griffith, immediately hatched a plan to bring Weir's buprenorphine-dispensing scheme to Xpress. Griffith and Spivey drafted fliers and went to doctor's offices to advertise that Xpress was now filling prescriptions for buprenorphine. The fliers included the price per dose of both Subutex and Suboxone. Initially,

---

[7] This building was purchased in 2016 by a prescriber, Gilbert Ghearing who shared the building with Anderson. Ghearing was a top prescriber of controlled substances at the pharmacies.

7

Weir ordered the buprenorphine for Xpress through Dale Hollow and a pharmacy employee either transported the buprenorphine to Xpress or Spivey came and got it from Dale Hollow. Eventually, Xpress began ordering its own buprenorphine and by 2018 it was one of the top 20 purchasers of buprenorphine in the state of Tennessee. Like Dale Hollow, the majority of buprenorphine dispensed by Xpress was buprenorphine-only products.

After Weir bought Xpress, he and Spivey promoted Michael Griffith to Xpress's pharmacist-in-charge. Up to that point, Griffith had been working part-time at Xpress as a pharmacist under Tara Anderson and continued to serve as a pharmacist at Xpress after Anderson left. Like Polston at Dale Hollow, Griffith had issues with his pharmacist license. Griffith had a suspended pharmacy license for stealing hydrocodone from a Walgreens where he previously worked as a pharmacist and his license was on probation for a portion of the time he worked at Xpress Pharmacy. As a result, he struggled to find steady employment as a pharmacist until Xpress and traveled over an hour and a half from his home to work at Xpress. Weir and Spivey took advantage of Griffith's situation and used his licensure issues as an excuse to pay him less, much like Weir had done with Polston at Dale Hollow.

In addition to bringing buprenorphine to Xpress, Xpress followed Dale Hollow's model and filled any prescription no matter the red flags. Like Dale Hollow, Xpress filled dangerous combinations of controlled substances to pharmacy patients who were abusing and diverting drugs.

Weir's plan worked and Xpress recovered financially as a result of the partnership between Weir and Spivey. Both parties benefited: Spivey was able to keep her pharmacy open and Weir was able to spread his lucrative buprenorphine scheme to neighboring Xpress, which allowed him to double his dispensing numbers across two pharmacies.

### D. Donaldson's Continued Role at Dale Hollow

Back at Dale Hollow, Donaldson continued to exert control over pharmacy operations, notwithstanding the fact that he was no longer the pharmacist-in-charge and was not allowed behind the pharmacy counter. Donaldson repeatedly threatened to take his patients from the pharmacy if Dale Hollow pharmacy staff did not fill prescriptions for "his patients." This would have put Dale Hollow out of business, as patients loyal to Donaldson still accounted for a large percentage of the pharmacy's business. Staff estimated that Donaldson brought in approximately 50-percent of Dale Hollow's business; Donaldson himself claimed he controlled 95-percent of Dale Hollow's patients. Weir knew that Dale Hollow would not survive without Donaldson. He described Donaldson as a powerful person who was not easy to fire because "he controls a lot of this type of business," referring to the pharmacy.

In November 2016, things finally came to a head between Weir and Donaldson. After Weir withheld payment to Donaldson for his patient recruitment efforts, Donaldson responded by ransacking the pharmacy. Law enforcement responded and Weir pressed charges. Documented on body worn camera footage, Donaldson was discovered with prescription oxycodone in his pocket that belonged to a patient of Dale Hollow Pharmacy. As a result, Donaldson was charged in Clay County General Sessions Court with illegal possession of a schedule II narcotic; the vandalism charge was dismissed. Donaldson pleaded guilty to the possession charge in February 2017. This criminal conduct violated his federal supervised release and he was sentenced to three months in a halfway house. At the hearing on the petition to revoke, Donaldson admitted to the possession of oxycodone, admitted to the vandalism of the pharmacy, and indicated it was because he had not been paid by Weir. Donaldson also stated that Weir asked Polston to write a letter in support of Donaldson saying there was no damage to the pharmacy.

When Donaldson was released, he went right back to work for Dale Hollow Pharmacy. This time, however, in an effort to conceal Donaldson's role at Dale Hollow, Weir physically moved Donaldson from Dale Hollow to Xpress Pharmacy's warehouse on the town square, stopped reporting Donaldson as an employee to the state of Tennessee, and started paying him illegal cash kickbacks off the books. Weir also purchased Donaldson's house from Bobby Oakley[8] and allowed Donaldson to continue to live there at a reduced rate in exchange for his work recruiting pharmacy patients. Weir did all this so that Donaldson would continue to keep his patients coming to Dale Hollow by whatever means necessary, the majority of whom were TennCare and Medicare beneficiaries, including by paying their co-pays, taking them to doctors' appointments, and driving them back to Dale Hollow and Xpress to fill their prescriptions.

### E. Pharmacy Inspections by DEA and the Board of Pharmacy

During this time, both Dale Hollow and Xpress held registrations with the Drug Enforcement Administration ("DEA") that allowed the pharmacies to dispense controlled substances subject to the limitations by law under the Controlled Substances Act and by regulation. Both pharmacies were also licensed as community retail pharmacies by the Tennessee Board of Pharmacy ("BOP"), which required the pharmacies to abide by rules and regulations associated with pharmacies and controlled substances in the state of Tennessee. Both the DEA registrations and state pharmacy licenses subjected the pharmacies to periodic inspections and audits by regulatory authorities at DEA and BOP.

#### 1. BOP Inspections and Investigations

Between 2014 and 2019, both Dale Hollow and Xpress were inspected and visited multiple

---

[8] A family home, Donaldson had transferred ownership of the house to his sister Anne and his brother-in-law Bobby Oakley when he went to prison. Anne died in 2015. In 2017, Oakley transferred the deed to Weir.

times by BOP inspectors. During these visits, BOP personnel repeatedly identified red flags. BOP warned pharmacy staff about how high their controlled substance dispensing was compared to noncontrolled. They educated pharmacy staff about proper dispensing practices, including Tennessee's buprenorphine-dispensing guidelines, as well as recordkeeping requirements. They repeatedly pointed out that the pharmacies were not resolving red flags of improper dispensing of controlled substances and informed pharmacy staff that not every patient could have allergies to naloxone and should not be coming from all over the state to Celina. Every time the BOP came back over the course of years, they found continuing violations and the same unresolved red flags.

In 2014, BOP investigated a complaint from a doctor alleging that Polston had dispensed controlled substances to a Dale Hollow patient using her name for a prescription she did not write. In 2015, after an investigation that corroborated these allegations and identified other dispensing issues at Dale Hollow, Polston entered into a Consent Order with the Board of Pharmacy, which placed restrictions on his license. Weir, Oakley, and Polston also entered into a related Agreed Order with the Board over the pharmacy's dispensing practices of controlled substances. As a term of that Agreed Order, Dale Hollow was required to hire an independent monitor. Under the monitorship, Dale Hollow was subjected to periodic inspections by the monitor. The monitor immediately noted that Donaldson, having a prior felony conviction for illegal dispensing out of the pharmacy, should be nowhere near the pharmacy. But Donaldson was not removed. Most of the monitor visits were announced in advance to Weir, and Weir made sure that Donaldson was not present when the monitor visited the pharmacy. Despite the monitorship visits, BOP continued to find issues every time they visited Dale Hollow.

### 2. DEA Inspections

By 2016, Dale Hollow had also popped up on DEA's radar. In April 2016, local law

enforcement reported Dale Hollow Pharmacy to the DEA after they responded to an alarm call at Dale Hollow Pharmacy. When officers arrived, Weir refused to allow them into the pharmacy despite obvious evidence that the pharmacy had been ransacked, including pill bottles on the floor. Weir was belligerent, swearing at law enforcement and insisting that they leave without clearing the pharmacy. Local law enforcement reached out to DEA about this incident with Weir and reported that Donaldson, recently released from prison, was working at Dale Hollow and that patients were traveling long distances to fill their prescriptions at Dale Hollow. A query of the Automation of Reports and Consolidated Orders System (ARCOS) conducted by DEA showed Dale Hollow was the second largest purchaser of buprenorphine in the DEA Nashville District Office's area of coverage in 2016.

Based on this information, in May 2016, DEA conducted an audit and inspection at Dale Hollow. During the inspection, DEA investigators discussed Dale Hollow's high ARCOS rankings with Weir, including that Dale Hollow was in the top three purchasers of buprenorphine in the state of Tennessee and the top purchaser of oxycodone, oxymorphone, and morphine in Clay County. DEA investigators also informed Weir about patients who were traveling long distances to fill prescriptions at Dale Hollow. Weir admitted that Donaldson was working for him at Dale Hollow as a "greeter" and that despite Donaldson's criminal history, customers valued his reputation in the community.

In October 2016, DEA personnel met with Weir, Oakley, and Polston and discussed the findings of their May 2016 inspection with Dale Hollow management. DEA identified numerous recordkeeping violations. DEA investigators reiterated that pharmacists were not permitted to fill prescriptions early and warned them about filling prescriptions from patients who lived a long distance from the pharmacy. DEA investigators asked why Dale Hollow was in the top three

purchasers of buprenorphine in the state of Tennessee and explained that Tennessee law requires that a person either have a documented allergy to naloxone or be pregnant or breastfeeding to receive buprenorphine-only products. Weir stated that the pharmacy would raise the price of Subutex and start calling doctors who prescribe Subutex in order to determine if the patient had a documented reason for the Subutex prescription.

Following the 2016 inspection, in March 2017, Weir, Oakley, and Polston executed a Memorandum of Agreement ("MOA") with the DEA regarding problematic buprenorphine dispensing practices and other violations identified during DEA's 2016 inspection of Dale Hollow Pharmacy. Pursuant to the terms of the MOA, Dale Hollow agreed to abide by all federal, state, and local laws and regulations pertaining to controlled substances. Dale Hollow also agreed to follow Tennessee state laws and regulations pertaining to the dispensation of buprenorphine products and shall document the reason for any dispensation of buprenorphine-only products. Dale Hollow agreed to immediately surrender its DEA registration if it they failed to comply with the terms of the MOA.

In June 2018, DEA and BOP returned to Dale Hollow. Instead of improving under the MOA and the BOP agreed order, and despite having a monitor visit, things had only gotten worse. A review of Dale Hollow's dispensing records revealed that close to 90% of buprenorphine dispensing was buprenorphine-only product. Many buprenorphine prescribers were located a far distance from the pharmacies and almost all of their patients supposedly had allergies to naloxone with no documentation to support it. Approximately 40% of all prescriptions filled were for controlled substances. DEA also found patients with multiple oxycodone prescriptions written the same day by different prescribers. DEA noted multiple violations of the MOA, including violations of recordkeeping requirements and failure to follow Tennessee state laws pertaining to

13

buprenorphine dispensing.

During the June 2018 inspection, Weir stated that doctors needed to be investigated because they are the ones writing the prescriptions. He stated, "we just fill them, the pharmacist is not responsible" and "I cannot tell a board-certified doctor no." He also said he did not believe there is an opioid problem and that it was just "media hype."

Following the inspection, DEA investigators instructed Weir to inform Xpress staff of its findings. DEA asked Weir if he would surrender the pharmacy's DEA registration for cause based on the violations of the MOA. Weir declined.

In August 2018, DEA returned to Celina and executed Administrative Inspection Warrants at both Dale Hollow and Xpress pharmacies in conjunction with the BOP. At Dale Hollow, the DEA retrieved evidence such as prescriptions. At Xpress, DEA performed an audit and inspection and found that close to 85% of its buprenorphine prescriptions were for buprenorphine-only products. Investigators informed Xpress personnel they were close to the top in the State of Tennessee for ordering buprenorphine and that buprenorphine-only and oxycodone-acetaminophen accounted for a very high proportion of what Xpress dispensed. DEA and BOP reminded Xpress personnel, including Weir, once again about the state laws on buprenorphine dispensing and that pharmacies typically only dispense 15-20% controlled substances whereas Xpress was at 50%. DEA and BOP reminded Xpress personnel about other red flags, including high morphine equivalencies and prescriptions paid for in cash.

## F.    Medicare and TennCare Enrollments and Certifications

In addition to having a registration with the DEA and the BOP to dispense controlled substances, the pharmacies were enrolled in federal health care benefit plans, including TennCare and many Medicare Part D plans. Celina is not an affluent town, and the majority of pharmacy

14

patients held TennCare or Medicare benefits. Through Weir and Spivey's certifications and signatures, the pharmacies repeatedly agreed to abide by the rules and laws of those programs, including promising to only submit claims for prescriptions that were valid, eligible for reimbursement, and medically necessary, and agreed not to violate the Anti-Kickback Statute.[9] Despite Weir and Spivey's knowledge that TennCare and Medicare did not pay for controlled substances that violated state or federal law, the pharmacies submitted millions of dollars in claims to TennCare and Medicare between 2014 and 2019, including for controlled substances that were known to be abused or diverted.[10]

## G.    The Pharmacies Close and Pharmacists-in-Charge Are Charged and Plead Guilty

In February 2019, both pharmacies were shut down by a temporary restraining order and preliminary injunction entered by this Court on February 7, 2019. The civil case against the pharmacies is still pending. In April 2019, a Grand Jury returned an indictment charging Polston with violations of federal law. In August 2020, Griffith was charged by criminal information with violations of federal law. In December 2020, Polston was charged by superseding information with additional violations of federal law. In 2021, both pleaded guilty to federal charges pursuant to cooperation agreements with the United States.

---

[9] Donaldson supplemented his role as a recruiter at Dale Hollow by perching at a desk by the door with a sign that advertised signing up patients for Medicare drug coverage.  So, in addition to recruiting patients, through illegal kickbacks and otherwise, Donaldson sat down with them inside of Dale Hollow and signed them up for Medicare and TennCare drug coverage.

[10] The patients identified in the indictment at Counts Three and Four filled combinations of controlled substances for years at the pharmacies despite repeated red flags. Xpress only stopped filling their prescriptions when both patients overdosed and died.  The patient at Counts Five and Six had multiple prescribers and pharmacies between 2015 and 2018. Dale Hollow continued to fill dangerous combinations for this patient.

15

## II. SUMMARY OF THE CHARGES

On November 15, 2021, a Grand Jury sitting in the Middle District of Tennessee returned the Indictment in this matter, which charges defendants Thomas Weir, William Donaldson, and Pamela Spivey with violations of the United States Code, including conspiracy to distribute Schedule II, III, and IV controlled substances without authorization, that is, without a legitimate medical purpose outside the usual course of professional practice, in violation of Title 21, United States Code, Section 846 (Count One). (DE #3.) The Indictment also charges all three defendants with a health care fraud conspiracy, in violation of Title 18, United States Code, Section 1349 (Count Two), and defendants Weir and Spivey with individual counts of health care fraud, in violation of Title 18, United States Code, Section 1347 (Counts Three through Six). (*Id*.) Finally, defendants Weir and Donaldson are charged with a conspiracy to defraud the United States and to commit the offense of violating the Anti-Kickback Statute, in violation of Title 18, United States Code, Section 371 (Count Seven).  (*Id*.)  The timeframe of the conduct alleged in the indictment spans the years 2014 through February 2019.

"The essential elements of the crime of conspiracy are that the alleged conspiracy existed, the defendant willfully became a member, and one of the conspirators knowingly committed at least one alleged overt act in furtherance of some object or purpose of the conspiracy." *United States v. Ross*, 190 F.3d 446, 450 (6th Cir. 1999).[11] A criminal conspiracy does not require proof that the unlawful purpose or object be achieved. "The government need not prove that the

---

[11] *Ross* adequately describes a conspiracy under Title 18, United States Code, Section 371. A conspiracy charged under Title 18, United States Code, Section 1349 or Title 21, United States Code, Section 846 does not require proof of an overt act. *See United States v. Rogers*, 769 F.3d 372, 381-82 (6th Cir. 2014). Nevertheless, the general principles of conspiracy law discussed herein apply equally to a charge under 18 U.S.C. § 371 as they do under 18 U.S.C. § 1349 and 21 U.S.C. § 846.

16

conspirators completed their agreed-upon drug crime." *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021) (citing *United States v. Robinson*, 547 F.3d 632, 638 (6th Cir. 2008)). Rather, the crime is *the agreement* itself. *See United States v. Frazier*, No. 3:17-CR-00130, 2023 WL 4930187, at *27 (M.D. Tenn. Aug. 2, 2023).

When determining whether a single conspiracy existed, courts consider "'the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings.'" *United States v. Williamson*, 656 F. App'x 175, 183 (6th Cir. 2016) (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)); *United States v. Caver*, 470 F.3d 220, 236 (6th Cir. 2006). "[A] defendant need not know every member of the conspiracy, the acts of other members, or even the full extent of the conspiracy to be held responsible for the acts of other members…[a]nd 'once the existence of a conspiracy is shown, the evidence linking an individual to a conspiracy need only be slight.'" *United States v. Smith-Kilpatrick*, 942 F.3d 734, 745 (6th Cir. 2019) (citations omitted).

Further, a defendant is not required to be present for the entire length of the alleged conspiracy to be found guilty of conspiring with others. *See, e.g., United States v. Gardiner*, 463 F.3d 445, 457-58 (6th Cir. 2006) (finding "each conspirator does not have to 'participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise.'") (citations omitted); *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004) ("'It has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined.'") (quoting *United States v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983)). And, while a defendant can affirmatively withdraw from a conspiracy, "[w]ithdrawal is not a defense when the object of the conspiracy has

been completed, or the defendant has committed an overt act towards its completion." *United States v. Chambers*, 944 F.2d 1253, 1265 (6th Cir. 1991) (superseded on different grounds).

The Sixth Circuit's Pattern Jury Instructions reflect these same principles. The United States is required to prove that a defendant "knew the conspiracy's main purpose," but it is not required to prove that the defendant "knew everything about the conspiracy, or everyone else involved, or that he was a member of it from the very beginning." Sixth Cir. Pattern Jury Instr. 3.03. Moreover, the United States does not have to prove "that a defendant played a major role in the conspiracy, or that his connection to it was substantial." *Id.* The pattern jury instructions also state that, "[o]nce an overt act is committed, the crime of conspiracy is complete[, a]nd any withdrawal after that point is no defense to the conspiracy charge." *Id.* at 3.11A(2)(C).

To prove a conspiracy under any of these statutes requires that a defendant know "the unlawful purpose of the agreement," and "join in the agreement 'willfully, that is, with the intent to further its unlawful purpose.'" *United States v. Ajayi*, 64 F.4th 243, 247–48 (5th Cir. 2023) (finding instruction in conspiracy jury charge in pharmacist dispensing trial appropriate in light of *Ruan v. United States*, 142 S. Ct. 2370 (2022)); *United States v. Iriele*, 977 F.3d 1155, 1169 (11th Cir. 2020). The government may prove the existence of an agreement "by proof of an understanding between the participants to engage in illicit conduct." *United States v. Achey*, 943 F.3d 909, 916 (11th Cir. 2019). In order to establish a "willful" violation of a statute, the United States generally must prove that a defendant acted with knowledge that his conduct was unlawful. *See United States v. Roth*, 628 F.3d 827, 834 (6th Cir. 2011). And the government may prove that understanding through circumstantial evidence. *Id*. The *mens rea* for conspiracy is specific intent, that is, the defendant must intend to agree and must intend that a substantive offense be committed

by some member of the conspiracy. *Ajayi*, 64 F.4th at 247 (citing *Ocasio v. United States*, 578 U.S. 282, 288 (2016)).

Although a conspiracy cannot be entered into with deliberate ignorance, because it must be knowingly and voluntarily entered into, the United States may prove knowledge of the unlawful aims or purposes of a conspiracy by deliberate ignorance. *United States v. Warshawsky*, 20 F.3d 204, 210-11 (6th Cir. 1994); *United States v. Lee*, 991 F.2d 343, 349–51 (6th Cir.1993).

### A.      Conspiracy to Violate the Drug Laws (Count One)

In this case, as it relates to Section 846, the unlawful purpose is to dispense controlled substances outside the pharmacies' authorization. "The drug laws make it unlawful to distribute a controlled substance knowingly or intentionally. 21 U.S.C. § 841(a)(1). The prohibition does not apply to pharmacists as long as their actions fall within the usual course of professional practice. A pharmacist thus violates this drug-distribution prohibition if he knowingly fills a controlled substance prescription issued outside professional norms." *United States v. Noel*, No. 20-6167, 2021 WL 5180915, at *3–4 (6th Cir. Nov. 8, 2021) (citing *United States v. Moore*, 423 U.S. 122, 124 (1975); *United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) (unpublished) (internal citations omitted). "Although the main 'responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner,' DEA regulations place a 'corresponding responsibility' on the 'pharmacist who fills the prescription.'" *Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 Fed. App'x 409, 412 (6th Cir. 2008) (citing 21 CFR § 1306.04(a)). Thus, when a pharmacist has suspicions about prescriptions, "they must at least verify the prescription's propriety, and if not satisfied by the answer they must refuse to dispense." *Id.* (citations omitted).

19

The government must therefore prove that there was an agreement to act knowingly and intentionally without authorization, that is, "that [the defendants] knowingly agreed to fill prescriptions for controlled substances outside the usual course of professional practice." *United States v. Iwas*, Case No. 18-20769, 2023 WL 6702114 at *2 (E.D. Mich. Oct. 12, 2023). This inquiry is not based "on the mental state of a hypothetical 'reasonable'" practitioner, but rather, "on the mental state of the defendant himself." *Ruan v. United States,* 142 S. Ct. 2370, 2381-82 (2022). Mental state can be proven through "circumstantial evidence," and "the more unreasonable a defendant's asserted beliefs or misunderstandings are, especially as measured against objective criteria, the more likely the jury will find that the Government has carried its burden of proving knowledge." *Id.* (cleaned up). As such, evidence of what a "reasonable" practitioner would do is relevant since it allows the jury to draw inferences about defendant's actual knowledge or intent. And assessing what a "reasonable" actor would do requires proof of all the attendant circumstances, including what the defendants observed and what they were told. The United States thus may prove *mens rea* circumstantially by showing that overall dispensing practices deviated so far from professional norms that a defendant must have known that his or her actions were unauthorized. It may also prove *mens rea* more directly—for example, by showing that a defendant or co-conspirator was presented with, and ignored or sought to conceal, red flags, such as when dispensing to a particular patient.

### B. Health Care Fraud Conspiracy (Count Two) & Health Care Fraud (Counts Three through Six)

The essential elements of health care fraud conspiracy under Section 1349 are "(1) two or more persons agreed to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose." *United States v. Pamatmat*, No. 11-20551, 2015 WL 1498895, at *3 (E.D. Mich. Mar.

20

31, 2015) (citations omitted). Health care fraud at Section 1347 is the object of the conspiracy. There are two ways to violate Section 1347 and therefore the conspiracy count has multiple objects: the first is that a defendant executed, and attempted to execute, a scheme and artifice to defraud a health care benefit program; the second is that a defendant executed, and attempted to execute, a scheme and artifice to obtain, by means of materially false and fraudulent pretenses, representations, and promises money and property owned by, and under the custody and control of, said health care benefit programs. Section 1347 does not require actual knowledge of the statute or specific intent to violate the statute. 18 U.S.C. § 1347(b); *see United States v. Elhorr*, 2014 WL 5666213, at *2 (E.D. Mich. Nov. 3, 2014) (finding that § 1347(b) clarifies that the government need not "prove that a defendant was aware of the existence of, or specifically intended to violate, § 1347 to be found guilty of violating that statute"). Rather, the government must prove that a defendant "(1) knowingly devised a scheme or artifice to defraud a health care benefit program [or obtain by means of false or fraudulent pretenses the property of a health care benefit program] in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Semrau*, 693 F.3d 510, 524 (6th Cir. 2012); *Pamatmat*, No. 11-20551, 2015 WL 1498895, at *3.

A scheme to defraud can be a general scheme to defraud with counts in the indictment constituting separate executions of the overall alleged fraud scheme. *United States v. Sosa-Baladron*, 800 F. App'x. 313, 322-24 (6th Cir. 2020) (finding an indictment can charge multiple counts of health care fraud stemming from a single scheme with each count constituting a separate execution of an overall alleged scheme). Here, the indictment charges a scheme to defraud pursuant

to Section 1347 with four specific executions of the scheme charged in substantive counts at Counts Three through Six.

### C. Conspiracy to Violate the Anti-Kickback Statute (Count Seven)

Defendants Weir and Donaldson are charged in Count Seven with a conspiracy at Title 18, United States Codes, Section 371 to defraud the United States and to violate the Anti-Kickback Statute. There are two prongs to Section 371 as charged and therefore the conspiracy count has multiple objects: to defraud the United States or to commit the offense of violating the Anti-Kickback Statute.

Under the defraud clause of Section 371, the United States is the target of the conspiracy. *Tanner v. United States*, 483 U.S. 107, 128-32 (1987). But "defraud" has a broader meaning than just cheating the government out of property or money, and includes "impairing, obstructing, or defeating the lawful function of any department of Government." *United States v. Collins*, 78 F.3d 1021, 1037-38 (6th Cir. 1996) (quoting *United States v. Jerkins*, 871 F.2d 598, 602 (6th Cir. 1989) (internal quotations omitted)) (affirming a conviction under § 371 for conspiracy to impair the functions of the IRS). The conspiracy to defraud the United States can also be committed indirectly by the use of third parties. "The fact that a false claim passes through the hands of a third party on its way . . . to the United States" does not relieve the defendants of criminal liability. *Tanner*, 483 U.S. at 129; *see also United States v. Gibson*, 881 F.2d 318, 321 (6th Cir. 1989 (stating United States can be the target of the conspiracy to defraud and yet be effected through a third party). Here, the conspiracy is to defraud the Medicare and Medicaid program, or in other words, the United States Department of Health and Human Services.

The object offense of violating the Anti-Kickback Statute is also divided into multiple objects: the subsection of the statute that criminalizes the knowing and willful offering and

payment of kickbacks and bribes, as well as the subsection that criminalizes the knowing and willful solicitation and receipt of kickbacks and bribes. 42 U.S.C. § 1320a-7b(b)(1)(A) and (B) and (b)(2)(A) and (B). It is a violation even if the entire purpose of the payment was not to induce a referral, as long as one purpose was to do so. Although the Sixth Circuit has never formally adopted what is known as "the one-purpose rule," district courts who have considered it have found that it applies. *See United States v. Vora*, 488 F. Supp. 3d 554, 563–64 (W.D. Ky. 2020) (adopting one purpose test as the more accurate depiction of the law); *United States v. SouthEast Eye Specialists*, *PLLC*, 570 F. Supp. 3d 561, 581 (M.D. Tenn. 2021) (finding "if at least one purpose of the remuneration is in return for a referral, then the statute has been violated"); *United States v. Neufeld*, 908 F. Supp. 491, 497 (S.D. Ohio 1995); *but see United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 698 (W.D. Ky. 2008) (declining to adopt the one-purpose rule).

The one-purpose rule is the law in other circuits as well. *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016); *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 30 (1st Cir. 1989); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985). In *Vora*, the Court explained that a person is induced to make referrals "if renumeration is persuasive enough to cause them to alter their behavior. A partial purpose is enough." *Vora*, 488 F. Supp. 3d at 563.

The Anti-Kickback Statute states that "specific intent" is not required to violate the statute. 42 U.S.C. § 1320a-7b(h). It is not necessary that the defendant had actual knowledge of the statute or specific intent to commit a violation of the statute, or that Medicare or Medicaid suffered any

23

financial loss. A conspiracy to violate the Anti-Kickback Statute simply requires that defendants agreed to do something they knew to be unlawful.

## III.    JURY INSTRUCTIONS

On November 20, 2023, the parties filed a set of joint agreed jury instructions (DE #238) and separate proposed instructions not agreed to by the parties (DE #237, 239). Most of the proposed instructions are pattern instructions and are agreed. Defendants objected to only a handful of the United States' proposed instructions, including a proposed instruction on deliberate ignorance, arguing that the instruction conflicts with *Ruan v. United States*, 142 S. Ct. 2370 (2022). (DE #237 at Page 5.) Defendants also proposed a modification to the elements instruction for Count One based on *Ruan* to which the United States objected. (*See* DE #237 at Page 2-4; DE #239 at Page 4-5.) The parties requested leave to amend and supplement their instructions based upon the evidence adduced at trial. The United States also filed a proposed verdict form to which there were no objections. (DE #219.)

## IV.    WITNESSES AND EXHIBITS

In its case-in-chief, the United States intends to call a variety of lay and expert witnesses who will testify about the facts summarized above and opine about the propriety of defendants' dispensing practices during the charged conspiracy period. Lay witnesses include local law enforcement officers, investigators with BOP and DEA, pharmacy patients and patient family members, and pharmacy employees, including former pharmacists-in-charge Polston and Griffith who are cooperating with the United States. Experts will testify about Medicare and TennCare, Tennessee's CSMD program, ARCOS data, dispensing patterns and peer comparisons, drug

diversion and red flags, pharmacists' corresponding responsibility, the review of specific pharmacy patient files, and the processing of digital evidence seized during the investigation.[12]

Additionally, if defendants continue to object to the admission of the numerous business records received and certified as such, the United States anticipates calling many records custodians.

As detailed in the United States' Exhibit List,[13] the United States also intends to offer a number of exhibits to meet its burden to prove the charges in the indictment. These exhibits generally fall into the following categories:

- Records and documents seized from the pharmacies, including prescriptions, patient pharmacy profiles, dispensing logs, invoices, communications with distributors and prescribers, invoices, training documents and employee certifications, pharmacy policies, copies of laws and regulations, and pharmacy handbooks and guidelines;

- Text message communications between defendants, their coconspirators, and other pharmacy employees;

- Records related to BOP and DEA inspections of the pharmacies and Dale Hollow's monitorship;

- Pharmacy and patient CSMD dispensing records and summary charts;

- ARCOS data and summary charts;

- Medicare and TennCare claims data, enrollments, applications, contracts, certifications, and summary charts;

- Photographs and body camera footage;

---

[12] As discussed below, defendants have moved to exclude much of this evidence and testimony.

[13] An Amended Exhibit List is forthcoming.

25

- Certified public records, including secretary of state records, property records, and state employment records;

- Relevant statutes and regulations; and

- Bank records and summary charts.

These proposed exhibits are essential to tell a coherent story and for the United States to meet its burden and prove defendants' knowledge and intent to engage in the charged conspiracies.

## V. EVIDENTIARY ISSUES

The United States has filed three motions in limine: an omnibus motion in limine to exclude certain evidence and arguments (DE #291); a motion in limine to admit certain business records pursuant to Federal Rules of Evidence 806 and 902 (DE #292); and a motion in limine to admit defendants' prior statements, co-conspirator statements, and statements by agents/employees of the pharmacies (DE #293). A supplement to docket entry 293 was also filed identifying additional prior statements of defendant Donaldson it seeks to admit. (DE #331.) Defendants have filed responses opposing these motions. (DE #309, #320, #311, #348.)

Defendants have filed 32 motions in limine challenging nearly every category of evidence the United States intends to introduce in its case in chief. The primary bases for exclusion of much of this evidence and testimony is that it is irrelevant and/or prejudicial. Given the overlap in arguments raised in defendants' motions, the United States attempted to file consolidated responses where appropriate to avoid unnecessary repetition. This was not always possible because of the staggered nature of the motions in limine deadlines in this case. The chart below attempts to organize defendants' pending motions into categories to assist the Court:

26

| CATEGORY | MOTIONS IN LIMINE | RESPONSES |
|---|---|---|
| Motions to exclude exhibits and related testimony alleged to be irrelevant and/or otherwise excludable under Rule 403 | DE #247: Joint Motion in Limine No. 1 to exclude photo of "Tulip Buck"<br><br>DE #250: Joint Motion in Limine No. 2 to limit and exclude needlessly cumulative exhibits<br><br>DE #251: Joint Motion in Limine No. 3 to exclude stale documents<br><br>DE #255: Joint Motion in Limine No. 6 to exclude memes as hearsay<br><br>DE #257: Joint Motion in Limine No. 8 to exclude policies, manuals, training guides, and similar materials<br><br>DE #260: Joint Motion in Limine No. 5 to exclude photographs of first responders and emergency vehicles near Xpress Pharmacy<br><br>DE #263: Joint Motion in Limine No. 9 to exclude course completion certificates | DE #302: Response in Opposition to #251, #263, #257, #247, #250, #255, and #260 |
|  | DE #281: Joint Motion in Limine Number Fourteen to Exclude Indecipherable Exhibits | DE #317: Response in Opposition to #281 |
|  | DE #284: Joint Motion In Limine No. 17: To Exclude Photos Of "Carlos The Monkey" | DE #314: Response in Opposition to #284 |
| Motions to exclude evidence as violative of Rule 404(b) and/or Rule 403 | DE #253: Donaldson Motion in Limine No. 1 to exclude Rule 404(b) Evidence | DE #301: Response in Opposition to #253 |
|  | DE #280: Joint Motion in Limine No. 13 to exclude references to issues with pharmacists' licenses | DE #316: Response in Opposition to #280 |
|  | DE #278: Donaldson Motion in Limine No. 5 to exclude any | DE #315: Response in Opposition to #278 |

| | references to Donaldson as a pharmacist | |
| --- | --- | --- |
| | DE #324 Sealed Defendants' Joint Motion in Limine Number 22 regarding references to Donaldson's drug dealing | DE #343: Response in Opposition to #324 |
| | DE #326: Sealed Spivey Motion in Limine No. 2 exclude evidence prohibited by Rule 404(a) and 404(b) | DE #340: Response in Opposition to #326 |
| Motions to exclude defendants' own statements | DE #262: Donaldson Motion in Limine No. 2 to exclude hearsay allegations of competing pharmacy and co-defendant | DE #303: Response in Opposition to #262 and #273 |
| | DE #273: Donaldson Motion in Limine No. 3 to exclude allegations of co-defendant Weir. | |
| | DE #287: Spivey Motion In Limine No. 1: Exclude Text Messages Sent By Co-Defendant Donaldson | DE #318: Response in Opposition to #287 |
| Motions to exclude expert testimony, data, and related summary charts | DE #271: Joint Motion in Limine No. 10 to exclude references to deceased patients | DE #300: Response in Opposition to #271 |
| | DE #282: Joint Motion In Limine No. 15 To Exclude Summary Charts And Related Testimony | DE #319: Response in Opposition to #282 and #283 |
| | De #283: Joint Motion in Limine No. 16, To Exclude Expert Declarations and Reports and Unduly Prejudicial Expert Testimony | |
| | DE #308: Joint Motion In Limine Number 19 To Limit Expert Testimony, Motion for Additional Disclosures | DE #342: Response in Opposition to #308 |
| | DE #322: Joint Motion in Limine Number Twenty One to Exclude | DE #341: Response in Opposition to #322 |

| | | |
|---|---|---|
| | Certain Summary Charts Related to Bank Accounts<br><br>DE #329: Joint Motion in Limine Number Twenty-Three to Exclude Government Exhibits (Uncharged Patient/Customer Prescription Data)<br><br>DE #330: Joint Motion in Limine Number Twenty-Four to Exclude Government's Exhibits (Uncharged Patient/Customer Raw CSMD Patient Report Data) | DE #345: Response in Opposition to #329 and #330 |
| Motions to limit lay witness testimony | DE #256: Joint Motion in Limine No. 7 to exclude lay testimony regarding addiction | DE #299: Response in Opposition to #256 |
| | DE #272: Joint Motion in Limine No. 11 to exclude references to the opioid epidemic | DE #312: Response in Opposition to #272 |
| | DE #321: Joint Motion in Limine Number Twenty to Exclude Any References by Lay Witnesses to Prescriptions Being Illegal or Otherwise Medically Unnecessary | DE #344: Response in Opposition to #321 |
| | DE #277: Donaldson Motion in Limine No. 4 to exclude any references to sexual encounters or preferences | DE #313: Response in Opposition to #277 |
| Motions to exclude statutes and regulations | DE# 252: Joint Motion in Limine No. 4 to exclude copies of statutes and regulations | DE #304: Response in Opposition to #252 |
| Motions to compel or otherwise order the United States to modify or disclose evidence | DE #290: Joint Motion to Compel, Or In The Alternative, To Exclude Evidence<br><br>DE# 279: Joint Motion in Limine No. 12 to identify demonstrative exhibits<br><br>DE #285: Joint Motion In Limine No. 18: To Require Government To | DE #320: Response in Opposition to #290, #279, #285 |

29

| | Remove Pharmacy-Specific Bate Stamps From Exhibits | |
|---|---|---|

## VI. RECIPROCAL DISCOVERY AND DEFENDANTS' EXHIBITS

This case was charged in November 2021. The defendants have yet to provide reciprocal discovery to the United States, and have not disclosed their own proposed exhibits, despite having the United States' exhibits since October 2023. Although the government has done its best to predict the issues that might be presented at the trial in this matter, without information from the defendants as to their defense case,[14] the United States cannot fully anticipate all of the issues that might arise at trial, nor can it be certain of what rebuttal evidence it might need to present.

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

BY: */s/ Sarah K. Bogni*
SARAH K. BOGNI
NANI M. GILKERSON
Assistant U. S. Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203
Telephone: (615) 736-5151

---

[14] Although the defense bears no burden, they have indicated their intent to at least present expert testimony. Defendant Donaldson has also indicated his intent to introduce video evidence of his "home and living situation." Other than defendants' expert disclosures, the government has not received any materials from defendants.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via CM/ECF to counsel for defendants, on this, the 1st of March, 2024.

/s/ Sarah K. Bogni
Sarah K. Bogni